**SIGNED THIS: July 26, 2013**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GENEVA ANHX IV LLC, | ) | Case No.  12-82750 |
| | ) | |
| Debtor. | ) | (Jointly Administered) |

## O P I N I O N

This matter is before the Court on the Amended Motion of AnchorBank, FSB (ANCHORBANK), for relief from the automatic stay or, in the alternative, to dismiss the case.  For the following reasons, the Amended Motion will be granted to modify the automatic stay to allow the state court foreclosure action to proceed.

### FACTUAL AND PROCEDURAL BACKGROUND

Thirteen (13) related chapter 11 cases were commenced on December 26, 2012.  Joint administration was ordered, but the estates have not been substantively consolidated. ANCHORBANK'S Amended Motion, filed in the lead case, Case No. 12-82750, seeks identical relief as to each Debtor.

Each Debtor is a limited liability company formed as a special purpose single investment entity to participate in ownership of a senior citizen residential facility (Park Vista) located in East Moline, Rock Island County, Illinois. Each Debtor owns a fractional interest in the real estate as a Tenant-in-Common (TIC) with the other owners. Ownership is divided among thirty-three (33) TIC owners. The thirteen (13) Debtors own a combined 29.22452% interest. The remaining 70.77548% is owned by twenty (20) LLC's that are not debtors in bankruptcy. The Debtors admit that the investment was structured so that the real estate would be owned in fractional shares by TIC owners in order to qualify for the tax deferral benefit accorded to like-kind exchanges under section 1031 of the Internal Revenue Code.

The real estate is encumbered with a mortgage granted to ANCHORBANK to secure repayment of a loan to Geneva Exchange Fund XV, LLC (GEF), evidenced by a Mortgage Note dated April 22, 2005, in the principal amount of $18,800,000.00. By its terms, the Mortgage Note was to mature on April 1, 2007. ANCHORBANK agreed to extend the maturity date on several occasions, with the last extension being to July 1, 2010. GEF also executed an Assignment of Leases and Rents in favor of ANCHORBANK. The Mortgage and the Assignment were duly recorded in the office of recorder of deeds for Rock Island County on April 29, 2005. When the Mortgage Note came due on July 1, 2010, it was not paid. Neither was it refinanced or extended by ANCHORBANK. Nor were the TIC owners able to obtain a take-out loan to substitute a new lender for ANCHORBANK.

ANCHORBANK filed a complaint for foreclosure in the Rock Island County Circuit Court on February 16, 2011. All thirty-three (33) TIC owners were named as defendants

and the state court determined that they were properly served with process.  On May 7, 2012, the circuit court entered an order granting partial summary judgment as to Count I of ANCHORBANK'S complaint, against certain defendants who failed to plead in opposition to summary judgment.  All of the Debtors were included among the defendants against whom judgment was entered.   The May 7, 2012, order provides that the "Defendants' interests in and liens on the mortgaged real estate are hereby terminated."

On September 10, 2012, the state court entered an order appointing ANCHORBANK as mortgagee in possession, vesting ANCHORBANK with exclusive possession of the real property, and granting it all the powers of a receiver to operate, manage and protect the property.  The order further provided that defendants are stayed from interfering with ANCHORBANK'S exercise of possession, control and management of the property.

The state court also entered a judgment of foreclosure on September 10, 2012, determining, among other things, that the balance of principal and interest due on the Mortgage Note as of July 17, 2012, was $20,225,166.58 with interest continuing to accrue at the rate of $2,872.22 per day, and ordering the property to be sold at foreclosure sale on a date to be determined.  The bankruptcy cases were filed before the foreclosure sale was to be held.

The Debtors readily acknowledge that the ownership of the Park Vista real estate was divided into fractional interests with title taken as tenants-in-common for the purpose of qualifying for like-kind exchange treatment under Internal Revenue Code section 1031. While the sale or exchange of property is ordinarily a taxable event, 26 U.S.C. § 1001 (c), Internal Revenue Code section 1031 provides an exception:

No gain or loss shall be recognized on the exchange of property held for

productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

26 U.S.C. § 1031(a)(1).

The nonrecognition of gain or loss from a like-kind exchange does not apply to an exchange of partnership interests. 26 U.S.C. § 1031(a)(2)(D). Although taxpayers cannot use a partnership interest as either relinquished property or replacement property in a like-kind exchange, this restriction may be avoided by structuring property ownership as a tenancy-in-common. 3 *Mertens Law of Federal Income Taxation* § 20B:18. Taxpayers must adhere to the tenancy-in-common structure and must not operate like a partnership. *Id.*

On March 19, 2002, the IRS released Revenue Procedure 2002-22, promulgating a new policy to issue advance rulings or determination letters on the questions of whether an undivided fractional interest in real property is an interest in an entity that is not eligible for a tax deferred exchange under § 1031(a)(1) of the Internal Revenue Code and whether such arrangements constitute separate entities for federal tax purposes under § 7701. Rev. Proc. 2002-22, 2002-14 I.R.B. 733, 2002-1 C.B. 733, 2002 WL 417295 (IRS RPR). While Rev. Proc. 2002-22 outlines procedural requirements for obtaining a letter ruling, and is not a pronouncement of substantive law, it does set forth fifteen guidelines so that taxpayers who adhere to the necessary conditions may obtain private letter rulings to assure them that their tenancy-in-common interest would not be considered partnership interests ineligible for like-kind exchange treatment. *Mertens* § 20B:18.

The guidelines include the requirement that each co-owner hold title as a tenant-in-common, the limitation that there may be no more than 35 co-owners, and the co-owners

may not file a joint tax return, conduct business under a common name, or hold themselves

out as a business entity.  The co-owners must unanimously approve major decisions,

including hiring a property manager and selling, leasing or mortgaging the property.  Each

co-owner must have the unilateral right to transfer, partition or encumber his undivided

interest in the property, but he may agree to a right of first refusal and other buy-sell

procedures based on fair market value purchase options.  The co-owners' activities must

be limited to those customarily performed in connection with the maintenance and repair

of rental real property.

In or about September, 2005, the thirty-three (33) TIC owners made an agreement

among themselves entitled "Co-Tenancy Ownership Covenants."  The Covenants track and

incorporate the guidelines set forth in Rev. Proc. 2002-22.  The Covenants include the

following provision:

> 12.    These Covenants shall not create any partnership or joint venture
> among or between the co-owners or any of them.  No Co-Owner shall
> file any partnership tax returns nor otherwise take any action
> respecting nor represent the relationship among the Co-Owners as
> other than Co-Owners of undivided interests in real property.  The
> only relationship among and between the Co-Owners hereunder shall
> be that of owners of the Premises as tenants in common subject to the
> terms hereof.  These Covenants shall supercede any prior co-tenancy
> agreement of the Co-Owners with respect to the Co-Owners'
> undivided interest in the Premises.

In support of Debtors' opposition to ANCHORBANK'S Amended Motion, they

submitted the Declaration of Sally Roseman, the managing member of one of the Debtors,

GENEVA ANHX XIV, LLC, which owns a 4.27816% undivided interest in the Park Vista

senior living facility.  According to the Roseman declaration, Park Vista is a 197 unit senior

living facility consisting of independent living units and assisted living units.

5

The initial phase of Park Vista was constructed in or around 1999.  In 2005, the then owners solicited investors to raise funds to expand the facility.  The investment was structured with tenant-in-common ownership to take advantage of the beneficial tax treatment for like-kind exchanges.  Approximately $8.77 million was raised from the investors.  Another $18 million was borrowed from ANCHORBANK.  The expansion was completed by 2007.  After several years of management difficulties, Grey Wolf Partners, Inc., took over management of the facility in 2009.  After being appointed mortgagee in possession, ANCHORBANK retained Grey Wolf as the manager of the property.  Grey Wolf is a Wisconsin corporation formed in 2009.  Its registered agent is Joseph R. Wagner, one of the original owners of Park Vista and one of the individuals who implemented the TIC investment structure.  Wagner personally guaranteed ANCHORBANK'S loan.

Wagner testified in his deposition that Grey Wolf's function is limited to asset management services including financial and tax reporting.  The business operation is managed by Park Vista Senior Housing Management, L.L.C., an Iowa limited liability company formed in 2009, whose manager is Julie M. Lonergan.  Wagner testified that he owns or controls a 2/3 interest in Park Vista Senior Housing Management, L.L.C., and that Julie Lonergan owns or controls a 1/3 interest.

The Debtors submitted an appraisal report prepared by Valuation Compliance, LLC as of August, 2012.  At the then current occupancy rate of 75%, using a capitalization rate of 9.5%, the "As Is" value of the "going concern," in the opinion of the appraiser, was $14,730,000.  In the appraiser's opinion, if the occupancy rate could be increased to 85%, the value would increase to $21,430,000.

In its Amended Motion, ANCHORBANK seeks modification of the automatic stay so that it may proceed with the Rock Island County foreclosure action.  ANCHORBANK alleges and argues that the facts establish that the Debtors have no equity in the real estate and the real estate is not necessary to an effective reorganization, which are the preconditions for relief from stay of an act against property under 11 U.S.C. § 362(d)(2). It argues that the lack of equity is not seriously disputed by the Debtors so that the only issue is whether the Debtors have a reasonable possibility of a successful reorganization within a reasonable time.  ANCHORBANK characterizes the Debtors' interest as tenants-in-common as a limited one so that they simply do not have the right, power or authority, either by contract, state law or bankruptcy law, to successfully reorganize in these chapter 11 cases.  In the alternative, ANCHORBANK seeks a determination that these cases involve "single asset real estate."   In the alternative, ANCHORBANK asks that the cases be dismissed as bad faith filings.

GEF, as the sole obligor on ANCHORBANK'S Mortgage Note, and Joseph R. Wagner (Wagner), individually, filed a Reply to the Debtors' brief in opposition to the Amended Motion.  They contend that pursuant to the Covenants and a separate Co-Tenancy Management Agreement, the TIC ownership structure was designed to provide passive income only to the TIC owners, with management outsourced to a third-party professional management company.

GEF and Wagner seek to correct or clarify certain facts.  They maintain that when the TIC structure was initiated, a Niebauer affiliate was in possession of and operated the facility pursuant to a master lease and paid a flat rate rent to the TIC owners.  The master

tenant subsequently terminated its lease rights and surrendered possession of the premises. When a replacement master tenant could not be found, the TIC owners were forced to accept a variable income payment based upon actual occupant rentals less operating expenses and management fees.  Distribution to the TIC owners ceased upon the Niebauer surrender because occupancy rates were not sufficient to generate a positive cash flow. After Park Vista Senior Housing Management, L.L.C., took over management in 2009, occupancy rates increased.

Wagner declares that ANCHORBANK made several offers to extend or refinance the maturing Mortgage Note, an action requiring unanimous consent of the TIC owners. Some TIC owners refused to consent, the unanimity requirement was not satisfied, and ANCHORBANK'S offers were not accepted.

In their Response to ANCHORBANK'S Amended Motion, the Debtors argue that they can successfully reorganize and intend to file a plan to do so.  They make a lengthy and repeated argument that the TIC owners have been operating as a joint venture since the termination of the Niebauer Master Lease.  The Debtors contend that their ownership interest is not limited to a tenancy-in-common real property interest, but extends to what they refer to as the "Business."  As best the Court can discern, the "Business" refers to the going concern or money making enterprise consisting of the providing of ancillary services to the residents of Park Vista beyond mere occupancy.  The Debtors rely upon the appraisal report of Valuation Compliance, LLC, which allocates $1,770,000 of the total appraised value to "Business Value."[1]  They argue that this going concern value is not subject to

---

[1]The appraisal report explains the Business Value determination as follows:

> Business enterprise value was based on the "As Is" going concern net operating income and market level coverage ratio of 1.25 which resulted in the net operating income attributable to the business

ANCHORBANK'S mortgage or security interest.

In their response to ANCHORBANK'S Amended Motion, the Debtors outline their

reorganization strategy as follows:

> The property is vital to the operation of Debtors' Business and a successful reorganization. To effectuate the Plan, Debtors will be filing an adversary to substantively consolidate 100% of the ownership of the Property and Business into the present bankruptcies. This will for practical purposes put the entire joint venture into bankruptcy. Debtor contends that this is appropriate since all of the TIC Owners share the same creditors, assets, and all of the revenues have been commingled. The adversary will also make a capital call on all of the TIC owners to provide new value funds to reorganize the consolidated cases in a total amount of approximately $3,500,000. The adversary will also request that the Court determine that the fair market value of any non-contributing TIC interests is zero and provide for the purchase of the non-contributing interests for a nominal sum or simply transfer title to the Consolidated Debtor. Debtors will reorganize the TIC and joint venture structure as a Limited Liability Company ("LLC"). As such, Debtor can propound and confirm a feasible plan or reorganization.

In their response, the Debtors also contend that the interest of the TIC owners is

superior to ANCHORBANK'S mortgage interest, arguing as follows:

> The AnchorBank Loan had an original term of about two years and was intended as bridge and/or construction financing. Lund, Wagner and GEF had promised to obtain a permanent loan prior to the maturity of the Loan. AnchorBank was aware that Park Vista was going to be sold to TIC investors and consented and/or ratified the transfer of the Interest to Debtor in 2005. However, because Niebauer's companies went out of business and other issues, Lund, Wagner and GEF were not able to obtain permanent financing and the AnchorBank Loan is still in place. The TIC Owners have been on title since 2005 and AnchorBank Loan was amended at least three times after that time which included increased obligations ("Amended Loan"). Debtors have not agreed to subordinate to the Amended Loan and Debtor contends that the TIC interest now have priority over the Amended Loan. Roseman Dec., paragraph 10.

## ANALYSIS

---

value. The business enterprise NOI was then capitalized at 15% (higher than the real estate rate due to the inherent risk of this portion of the income) resulting in a value of $1,770,000 (rounded) business enterprise value.

As a preliminary issue, the Debtors suggest that the Court may hold an evidentiary hearing. Stay relief motions are intended to be summary proceedings that do not involve a full blown trial or a final adjudication on the merits of claims or defenses. *Matter of Vitreous Steel Products Co.,* 911 F.2d 1223, 1232 (7th Cir. 1990); *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 31 (1st Cir. 1994). The primary stay relief issue requires the Court to evaluate whether the Debtors have proposed a feasible theory of reorganization sufficient to support a determination that they have a reasonable possibility of a successful reorganization within a reasonable time. In the Court's view, the record is sufficient to enable the Court to make that determination without the presentation of testimony at an evidentiary hearing.

**Effect of Foreclosure Orders**

Initially, the effect of the judgment of foreclosure must be defined. It is clear under Illinois law that a foreclosure judgment does not operate to divest one who holds title of his property interest. It is not until the property is sold at the foreclosure sale that the owner's property interest is lost. If a bankruptcy petition is filed prior to sale, the real estate becomes property of the estate to the extent of the debtor's title, so that a reorganizing debtor may modify the rights of holders of claims secured by the real estate pursuant to 11 U.S.C. § 1123(b)(5) and may cure defaults on obligations owed to creditors holding claims secured by the real estate pursuant to 11 U.S.C. 1123(a)(5)(G). *See, Matter of Madison Hotel Associates,* 749 F.2d 410 (7th Cir. 1984); *In re Kohler,* 107 B.R. 167 (Bankr.S.D.Ill. 1989).

When the chapter 11 petitions were filed on December 20, 2012, each Debtor's fractional ownership interest in the Park Vista real estate, as one of thirty-three co-tenants-

in-common, became property of the estate, notwithstanding the state court's prior entry of a judgment of foreclosure and an order placing ANCHORBANK in possession as mortgagee in possession pursuant to 735 ILCS 5/15-1703.

This is not to say that those state court orders have no continuing force and effect in these bankruptcy cases, however.  Although not immediately appealable without an Illinois Supreme Court Rule 304(a) finding, a judgment of foreclosure is a final order under Illinois law.  *EMC Mortg. Corp. v.  Kemp,* 2012 IL 113419, 982 N.E.2d 152, 367 Ill.Dec.  474, 476 (2012) (judgment of foreclosure is final as to the matters it adjudicates).  The parties to a foreclosure action are collaterally estopped from relitigating issues determined in a judgment of foreclosure.  *First Nat. Bank of Hoffman Estates v.  Fabbrini,* 255 Ill.App.3d 99, 102, 627 N.E.2d 356 (Ill.App. 1 Dist. 1993).  A judgment of foreclosure is also accorded *res judicata* effect.  *Farm Credit Bank of St. Louis v.  Brown,* 217 Ill.App.3d 730, 739, 577 N.E.2d 906 (Ill.App. 5 Dist. 1991).  The doctrine of *res judicata* operates as a bar to all matters that were offered to defeat a claim in the prior action as well as all matters that could have been offered for that purpose.  *Arvia v.  Madigan,* 209 Ill.2d 520, 533, 809 N.E.2d 88 (2004).

A judgment of foreclosure constitutes a determination of the validity of the plaintiff's mortgage lien, the priority of the lien relative to the interests of all defendants, a determination of the plaintiff's right to enforce the lien through foreclosure, as well as a determination of the amounts owed and secured by the mortgage.  The order granting partial summary judgment and the judgment of foreclosure entered by the Rock Island County Circuit Court constitute a final, binding adjudication that ANCHORBANK holds a valid mortgage lien on the real estate, that its lien is prior and superior to the rights and

11

interests of all other parties including the TIC owners, that it has the lawful right to sell the

real estate at foreclosure sale unless its secured debt is first paid in full, and that the balance

of principal and interest due on its debt was $20,225,166.58 as of July 17, 2012. The Debtors

are bound by those determinations. So is a federal bankruptcy court which must give "the

same preclusive effect to state court judgments that those judgments would be given in the

courts of the state from which the judgments emerged." 28 U.S.C. § 1738; *Kremer v.*

*Chemical Const. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883 (1982).

Based upon these principles, the Debtors' argument that their ownership interest is

no longer subject or subordinate to ANCHORBANK'S mortgage lien cannot stand. The

judgment of foreclosure is a final adjudication that ANCHORBANK holds a first mortgage

lien that encumbers the Park Vista real estate and that is prior and superior to the interest

of all foreclosure defendants including the TIC owners. That judgment would be accorded

preclusive effect as to the Debtors by Illinois courts and, therefore, must be given the same

preclusive effect by this federal bankruptcy court.

In conjunction with the ANCHORBANK loan, GEF executed an assignment of leases

and rents. Through the assignment, GEF transferred and assigned to ANCHORBANK its

interest in "any and all leases" including the "right to collect and receive all rents, income,

payments and profits arising out of" the leases or the "premises." When the state

foreclosure court awarded possession of the property to ANCHORBANK as mortgagee in

possession, it necessarily determined that ANCHORBANK had, pursuant to the mortgage

and related documents, "the right to receive the rents, issues and profits thereof." 735 ILCS

5/15-1703(a)(1). Thus, that order deflates the Debtors' contention that they are entitled to

the profits from the "Business." The nature and extent of ANCHORBANK'S collateral is determined by the agreements made and interest conveyed by its borrower, GEF. Subsequent managerial changes and revisions to the terms of the master lease or management agreements would not alter the collateral interest obtained at the outset by ANCHORBANK. Even if the Debtors own some aspect of the "Business" as an unencumbered interest, that would not affect ANCHORBANK'S entitlement to modification of the stay to foreclose on its collateral.[2]

**Effective Reorganization Standard**

Under section 362(d)(2), the automatic stay of an act against property of the estate is modifiable if the debtor has no equity in the property and the property is not necessary to an effective reorganization. Under section 362(d)(3), if the property is single asset real estate, the stay is modifiable unless the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time. Having submitted an appraisal showing a value several million dollars less than the amount of ANCHORBANK'S mortgage debt, as determined by the state court, the Debtors concede that they have no equity in the Park Vista real estate, but they claim to have equity in the going concern value, if it is determined to be unencumbered.

According to the Supreme Court, the "effective reorganization" standard of section 362(d)(2) should be defined in terms of a likelihood of a successful reorganization.

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires

---

[2]It is not necessary for this Court to determine whether the Debtors own any unencumbered assets. If they believe they do, they may seek protection of those interests in the foreclosure action. Relief from the automatic stay, applying a colorable claim standard, is ordinarily not a final adjudication of a party's ownership interest in property. *Garrett v. BNC Mortg., Inc.,* --- F.Supp.2d ----, 2013 WL 878749 (D.Colo. 2013).

is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*.  This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*United Sav. Ass'n of Texas v.  Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 375-76, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).  A similar standard has been implemented by Congress in section 362(d)(3)(A), added by BAPCPA to address the stay of an act against single asset real estate, that a plan must have a "reasonable possibility of being confirmed within a reasonable time."

The "effective reorganization" requirement is a feasibility standard rather than a necessity standard.  *In re 8th Street Village Ltd. Partnership,* 94 B.R. 993, 996 (N.D.Ill. 1988).  If a proposed or contemplated plan is "patently unconfirmable," the effective reorganization standard is not met.  *In re Batista-Sanchez,* --- B.R. ----, 2013 WL 2403323 at * 6 (Bankr.N.D.Ill.  2013).

Since the Debtors are not personally liable on the Mortgage Note, as to them, ANCHORBANK'S claim is nonrecourse.  Nevertheless, a nonrecourse mortgage interest evidences a right to payment through sale of the property at foreclosure, so that the mortgagee holds a "claim" against property of the estate within the scope of section 101(5). *Johnson v.  Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991).

Debtors argue that they intend to reorganize Park Vista by bringing the "entire joint venture" before the Court through substantive consolidation of the estates of the Debtors with the TIC ownership interests of the non-debtor TIC owners.  They then intend to convert the unified interest to a limited liability company.  The Debtors propose a

14

procedure to terminate the interest of any non-debtor TIC owner who doesn't consent to their plan. They will make a capital call for each TIC owner to contribute new-value in the amount of $35,000 for each 1% fractional share of ownership. If any TIC owner does not meet the capital call, the Debtors will ask the Court to order each dissenting owner to relinquish their ownership interest in exchange for a nominal payment of $100 for each 1% fractional interest. Any such forfeited ownership interests will be offered for purchase to the remaining TIC owners or sold to outside investors. The Debtors acknowledge that these logistical contortions are necessitated because the TIC structure prevents the Debtors from exercising control absent unanimous consent. They view the joint venture theory as a way for the Court to recognize "the reality of the situation" and to exercise jurisdiction over all of the TIC owners. In reply, ANCHORBANK contends that the substantive consolidation proposal is misapplied as a sword against the non-debtor TIC owners.

**Substantive Consolidation**

Substantive consolidation is an equitable remedy designed to ensure fair treatment of a body of creditors who dealt with two or more related entities. The remedy calls for pooling the assets of and claims against the related entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors for purposes of voting on a reorganization plan. *In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir. 1988). Apart from fairness to creditors, the remedy has also been used when the affairs of two debtors are so hopelessly entangled that efficiency dictates the separate estates be administered as one. *In re Bonham,* 229 F.3d 750, 766 (9th Cir. 2000).

The use of substantive consolidation to force an unwilling non-debtor entity to merge its assets into a bankruptcy estate is especially problematic. *See In re Cordia*

*Communications Corp.*, 2012 WL 379776 (Bankr.M.D.Fla. 2012) (denying request to substantively consolidate non-debtor entities under § 105(a) as not "necessary or appropriate" to carry out any legitimate bankruptcy purpose).

In *Bonham,* involving facts starkly dissimilar from those at bar, the Ninth Circuit determined that bankruptcy courts have the authority, derived from their general equity powers, to order substantive consolidation.   The court determined that the bankruptcy court did not err in ordering the substantive consolidation of two non-debtor corporations with the bankruptcy estate of the individual chapter 7 debtor who was the sole shareholder and director of both corporations, and who used the entities to engage in a Ponzi scheme. The decision was supported by the bankruptcy court's finding that the corporations were mere instrumentalities of the debtor with no separate existence of their own, that her assets were commingled with those of the corporations, that there was no clear demarcation between the affairs of the debtor and the entities, so that disentangling the affairs of the debtor and the two corporate entities would be needlessly expensive and possibly futile. 229 F.3d at 766-67.   After noting that substantive consolidation should only be used "sparingly," the court reasoned that treating the debtor and the "corporate shells" as a single economic unit was the only way that all Ponzi scheme claimants could receive an equitable distribution of assets.[3]  *Id.* at 768.

The Seventh Circuit Court of Appeals has not had occasion to address the issues surrounding the equitable remedy of substantive consolidation.   However, it is clear that

---

[3]To similar effect is *In re Stayton SW Assisted Living, L.L.C.,* 2009 WL 5173512 (D.Or. 2009), cited by the Debtors in their Response, where the court ordered substantive consolidation after finding the financial affairs of several related entities were hopelessly entangled and impossible to "unscramble," and after the SEC had filed a complaint alleging the entities were operated virtually as a Ponzi scheme so that consolidation was necessary to assure equality of treatment of all creditors.   Like *Bonham,* these facts are not at all similar to those at bar.

the Seventh Circuit takes a narrow view of a bankruptcy court's use of its equity powers. The power conferred by section 105(a) is one to implement rather than to override. *In re Kmart Corp.,* 359 F.3d 866, 871 (7th Cir. 2004) (rejecting the debtor's contention that payment of unsecured claims to "critical vendors" should be allowed out of necessity for an effective reorganization). When a specific Code section addresses an issue, a bankruptcy court may not employ its equitable powers to achieve a result not contemplated by the Code or to expand or contract a right explicitly granted. *Matter of Fesco Plastics Corp., Inc.,* 996 F.2d 152, 154-55 (7th Cir. 1993). A bankruptcy court may not use its equitable powers to circumvent the law. *Matter of Greenig,* 152 F.3d 631, 635 (7th Cir. 1998).

Apart from the conceptual problems with forcing nondebtor entities to surrender their assets to a bankruptcy estate, the Debtors propose to use substantive consolidation for a purpose that has never been sanctioned by any court and that is inconsistent with established precedent. Its use here is not to ensure the equitable treatment of creditors (*viz.* ANCHORBANK). Neither is it because the affairs of the thirty-three TIC owners are hopelessly entangled – they are not. The Debtors propose to use substantive consolidation to coerce the nonconsenting TIC owners to go along with the Debtors' plan or lose their interests.

In this Court's view, the proposed use of substantive consolidation as a sword against the nondebtor TIC owners is improper and impermissible. *See In re Owens Corning,* 419 F.3d 195, 211-16 (3d Cir. 2005) (substantive consolidation is properly used defensively to remedy identifiable harms, not offensively to achieve advantage over particular group). The rights of the nondebtor TIC owners are defined by their status as holders of a tenancy-in-common estate. Substantive consolidation cannot be used to deprive them of those

17

rights.

The fact that bankruptcy is an equitable proceeding does not give a bankruptcy court (or a debtor) a "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be." *Matter of Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986). A bankruptcy court may not create rights outside of those specified in the Bankruptcy Code. *Matter of Lloyd,* 37 F.3d 271, 275 (7th Cir. 1994). Section 105 does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law. *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986); *Southern Ry. Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir. 1985). Bankruptcy courts are not permitted in the name of equity to create additional property rights or remedies in favor of a debtor unless those rights or remedies are statutorily authorized under the Bankruptcy Code. *In re Holyoke Nursing Home, Inc.* 372 F.3d 1, 5 (1st Cir. 2004).

As the powers afforded chapter 11 debtors by the Bankruptcy Code do not enable the Debtors to get where they want to go, their arguments seek to bulldoze a new path, with new rights, over the top of the Code. The Bankruptcy Code, however, is a comprehensive statutory scheme intended to occupy the field. If the Code does not expressly grant a particular right or power to a debtor, Congress presumably did not intend it to be created or exercised.

Bankruptcy courts should be especially solicitous of property rights.

Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party

18

> is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.

*Butner v. U.S.*, 440 U.S. 48, 55, 99 S.Ct. 914 (1979).

The nondebtor TIC owners are entitled to the same protection of their interests they would have under state law if no bankruptcy had ensued.  The Debtors point to no Bankruptcy Code provision that would give them the power to modify the rights of those nondebtors.  The nondebtor TIC owners' rights exist as a matter of Illinois real property law, not as some burdensome executory contract that the Debtors may reject under section 365.  These bankruptcy filings do not empower the Debtors to eliminate or alter the rights of the non-debtor TIC owners in the manner they propose.  Thus, the reorganization theory offered here by the Debtors is not feasible.

**Joint Venture**

The Debtors make the repeated argument that they should not be treated merely as tenants-in-common, but rather as joint venturers.  They justify this argument principally by contending that after the Niebauer management company left, their distributional rights changed from a fixed rent payment to a variable one tied to profitability.  So rather than being mere landlords, they became more like entrepreneurs.

The Debtors' joint venture argument suffers from several serious flaws.  First, other than the Roseman declaration, there is no evidence in the record that any of the TIC owners have taken any steps to establish a joint venture.  A joint venture is an association of two or more persons to carry out a single enterprise for profit and the rights and liabilities of its members are tested by the same legal principles which govern partnerships.  *Smith v.*

19

*Metropolitan Sanitary Dist. of Greater Chicago,* 77 Ill.2d 313, 318, 396 N.E.2d 524 (1979).  As a practical matter, the only distinction between the two entities is that a joint venture relates to a single specific enterprise or transaction, while a partnership relates to a general business of a particular kind.  *Groark v. Thorleif Larsen* & Son, Inc., 231 Ill.App.3d 61, 66, 596 N.E.2d 78 (Ill.App. 1 Dist. 1992).  Every member of a joint venture is liable to third persons for acts of his fellow venturers done in the course of the enterprise.  *Id.*

Whether a joint venture exists is a matter of the intention of the alleged joint venturers.  *Daniels v. Corrigan,* 382 Ill.App.3d 66, 80, 886 N.E.2d 1193 (Ill.App. 1 Dist. 2008).  Perhaps the most important criterion of a joint venture is joint control and management of the property.  *Herst v. Chark,* 219 Ill.App.3d 690, 694, 579 N.E.2d 990 (Ill.App. 1 Dist. 1991).  The party who contends that a joint venture exists has the burden of proving that the parties intended such a relationship.  *Yokel v. Hite,* 348 Ill.App.3d 703, 708, 809 N.E.2d 721 (Ill.App. 5 Dist. 2004).

Another fundamental difficulty the Debtors face with their joint venture theory is that the TIC owners have expressly disavowed that they were operating as joint venturers or partners.  Such a disavowal was necessary to support the like-kind exchange eligibility that was the major purpose behind the Park Vista ownership structure.  In her declaration, Sally Roseman, on behalf of one TIC owner, appears to repudiate those limitations previously agreed upon as she states an intent to actively manage the facility.  The record contains no evidence that any of the other Debtor or non-debtor TIC owners have repudiated their prior intent and now desire or intend to act as joint venturers.[4]  While an

---

[4] In effect, Sally Roseman, in her declaration, "declares" that the TIC owner entity that she manages is now operating as part of a joint venture rather than a mere tenancy-in-common.  The Debtors ask the Court to adopt her declared intention as determinative of the intent of the other TIC owners.  The Court determines that Roseman's declaration of her intent may not be imputed to any other TIC owner.

inference could be drawn that the other Debtor TIC owners, by filing voluntary petitions, hold the same intent as Ms. Roseman, the only reasonable inference is that the TIC owners who did not file a voluntary chapter 11 petition do not hold such an intent.

Even if each of the Debtor TIC owners agree that they now desire and intend to operate a joint venture and to actively manage the Park Vista property, the Debtors are not able to reorganize as they propose. The non-debtor TIC owners have certain rights that exist as a matter of Illinois real property law, including an equal right of possession and an absolute right to partition. *Westerdale v. Grossman,* 312 Ill.App.3d 884, 886, 728 N.E.2d 67 (Ill.App. 3 Dist. 2000); *NAB Bank v. LaSalle Bank, N.A.,* 2013 IL App (1st) 121147, 984 N.E.2d 154, 162. Nothing in the Bankruptcy Code gives the Debtors the power to eliminate or modify the rights held by the non-debtor co-owners as a result of their status as tenants-in-common. As the Supreme Court has stated, property interests are created and defined by state law. Unless some federal interest requires a different result, property interests should be analyzed no differently simply because an interested party is involved in a bankruptcy proceeding. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914 (1979).

In addition, since joint venturers are treated the same as partners under Illinois law, if Debtors' joint venture theory were to be accepted, the Bankruptcy Code provisions that pertain to partnerships would apply. A general partnership, or a joint venture, may commence a voluntary chapter 11 case only with the consent of all partners or venturers. *In re Dolton Lodge Trust No. 35188,* 22 B.R. 918, 924 (Bankr.N.D.Ill. 1982). Fewer than all of the partners may only commence a bankruptcy case against the partnership by filing an involuntary petition. 11 U.S.C. § 303(b)(3). *In re Memphis-Friday's Associates,* 88 B.R. 821

21

(Bankr.W.D.Tenn. 1988). Where the Bankruptcy Code sets forth a specific procedure that applies in a particular circumstance, that procedure must be followed. The Debtors' proposal to "substantively consolidate" the ownership interests of the twenty (20) non-debtor TIC owners as a mechanism to impose bankruptcy jurisdiction over the nonconsenting TIC owners is not a viable alternative. *See In re S&G Financial Services,* 451 B.R. 573, 582 (Bankr.S.D.Fla. 2011) (substantive consolidation and the right to file an involuntary petition are two entirely different remedies).

The Debtors' proposal is problematic for yet an additional reason. Section 363(h) permits, if certain conditions are satisfied, the sale of property where the debtor is a tenant in common with one or more non-debtor tenant in common owners, but only if the sale would yield proceeds for the estate. Partial satisfaction of an undersecured debt is not a satisfactory benefit to the estate within the meaning of section 363(h). *In re Haley,* 100 B.R. 13 (Bankr.N.D.Cal. 1989). ANCHORBANK is significantly undersecured. So sale of the Park Vista property is not a feasible option for the Debtors. In fact, the lack of equity strongly favors modification of the automatic stay.

## CONCLUSION

The Court recognizes the broader implications of this decision. The 33 TIC owners joined together as investors in the Park Vista development. Because they wanted the tax benefit of like-kind exchange eligibility, they associated as tenants-in-common. They could have associated as partners or members of an LLC or shareholders of a corporation, but they decided otherwise primarily for tax reasons. They are now in danger of losing their

entire investment, so retaining like-kind exchange eligibility is the least of their worries. But a tenancy-in-common is an inflexible form of ownership. The 13 TIC owners who filed voluntary chapter 11 petitions wish to use bankruptcy to jettison that form of ownership and its attendant limitations and transition to a more flexible association. The 20 TIC owners who did not file a petition apparently disagree. Outside of bankruptcy, the unanimous consent of all TIC owners would be necessary to achieve the goal of a different form of association and ownership. In this Court's view, nothing in the Bankruptcy Code changes that requirement. Bankruptcy does not provide the remedy the Debtors seek.

The Debtors have conceded they have no equity in the Park Vista property that ANCHORBANK seeks to foreclose. For the reasons set forth herein, the Court determines that the Debtors do not have a reasonable possibility of a successful reorganization within a reasonable time. Accordingly, the property is not necessary to an effective reorganization that is in prospect. Therefore, the automatic stay should be modified pursuant to section 362(d)(2) to permit ANCHORBANK to continue to prosecute the foreclosure action pending in the Rock Island County Circuit Court. It is not necessary for the Court to address the alternative theories asserted by ANCHORBANK.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###